UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,

v.

LOUIS A. WILSON,

    Defendant.

Criminal Action No. 96-319-01 (CKK)
Civil Action No. 00-2388 (CKK)

**MEMORANDUM OPINION**
(September 12, 2005)

This matter relates to the conviction and sentencing of Petitioner Louis A. Wilson for

charges related to the death of Leroy Copeland, a government witness in the trial of James

Wilson, Petitioner's brother.  Currently before the Court is Petitioner's Motion to Vacate, Set

Aside or Correct Sentence pursuant to 28 U.S.C. § 2255.  Petitioner claims that he is entitled to

collateral relief because (1) his conviction was based on perjured testimony; (2) the Government

did not disclose exculpatory information that was in its possession prior to trial, in violation of

*Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); and (3) Petitioner

received ineffective assistance of counsel at trial in violation of the fundamental guarantees of

the Sixth Amendment.  Additionally, Petitioner adopts the arguments and authorities set forth in

the § 2255 motion of his co-defendant and brother, Ralph Wilson.[1]  Petitioner requests an

evidentiary hearing to resolve the issues raised in his Motion.  The Government opposes

Petitioner's Motion on the grounds that Petitioner's perjured testimony and *Brady* claims are

procedurally barred and do not demonstrate prejudice, and Petitioner's ineffective assistance of

---

[1] The Court shall treat the claims each party has argued in its Memorandum Opinion
dealing with that party's motion.

counsel claims lack merit.  After a careful review of the parties' briefs and the relevant case law, the Court finds that an evidentiary hearing is unnecessary to the resolution of Petitioner's Motion.[2]  For the reasons set forth below in this Memorandum Opinion, the Court shall deny Petitioner's Motion to Vacate, Set Aside or Correct Sentence pursuant to 28 U.S.C. § 2255.

## I: BACKGROUND

This Section 2255 motion arises out of the murder of a Government witness scheduled to testify in the trial of James "Toe" Wilson, who was charged with robbing a United States Post Office.  The Government's case against James Wilson was based primarily on information obtained by a witness, decedent Leroy Copeland, who had taped a conversation with James Wilson at the Lorton Reformatory ("the Lorton conversation") on July 28, 1995.  Tr. 2A:8; 4:13, 125.[3]  The Government turned over copies of the tape and transcript of the Lorton conversation, which revealed Copeland's identity, to James Wilson's attorney, Mr. Steven Jacoby, on the condition that the attorney not share copies of the tape and transcript with anyone without the Government's prior permission.  Tr. 3:20-26, 105-07; GX:34.  Shortly before the March 26, 1996, trial date, on March 20, James Wilson's attorney met with James's wife and brother Ralph to discuss the evidence against James.  Tr. 3:108-09; 7:100-01.  During the meeting, James's

---

[2]  The Court has considered the following briefs in its ruling: (1) Petitioner Louis Wilson's Motion to Vacate, Set Aside or Correct Sentence ("Pet'r Mot."), (2) Government's Opposition to [Petitioner's] Motion ("Gov't Opp'n"), (3) Petitioner's Reply to Government's Opposition ("Pet'r Reply"), (4) Petitioner's first Supplemental Memorandum of Points and Authorities in Support of Motion ("Pet'r 1st Supp."), and (5) Petitioner's second Supplement to Motion and Motion to Adopt Arguments, Points, and Authorities of Co-Defendant Ralph Wilson ("Pet'r 2nd Supp.").

[3]  References to the trial transcripts herein are by volume number and by page (e.g., Volume I at page 5 is "Tr. 1:5"), or where no volume number is indicated, referenced by date (e.g., 1/22/97 Tr. 1").

attorney alerted the family members to Copeland's role in the case against James by playing

portions of the Lorton conversation between Copeland and James Wilson.  Tr. 3:109-124; 7:101.

On the evening of March 25, 1996, Leroy Copeland was shot and killed at 5th and O Streets,

N.W., in Washington D.C.  Tr. 4:17-18, 22-23, 56; 6:100-01, 125-126.

On September 19, 1996, Defendants Louis "Spuds" Wilson and Ralph Wilson, brothers

of James Wilson, along with another co-defendant, Marcellus Judd, were charged with (1)

conspiracy to kill a federal witness in violation of 18 U.S.C. § 371, (2) killing a federal witness in

violation of 18 U.S.C. § 1512(a)(1)(A), (3) retaliation against a federal witness in violation of 18

U.S.C. § 1513(a)(1)(B) and (2), and (4) first degree murder while armed in violation of D.C.

Code §§ 2401 and 3202.  Defendant Louis Wilson was additionally charged with two counts of

using a firearm during and in relation to a crime of violence in violation of 18 U.S.C. § 924(c),

and possession of a firearm during a crime of violence in violation of D.C. Code § 22-3204(b).

Following a trial in front of the Honorable Norma Holloway Johnson, Defendants Louis and

Ralph Wilson were found guilty on all counts by a jury on March 21, 1997.  On June 5, 1997,

Defendant Ralph Wilson's Motion to Set Aside the Verdict was denied, and he was sentenced to

life imprisonment in June 1997; Louis Wilson was sentenced to life imprisonment plus two

consecutive five year terms of imprisonment in September 1997.  On June 10, 1997, Defendant

Louis Wilson noted his appeal.

On November 20, 1998, the United States Court of Appeals for the District of Columbia

affirmed all convictions of the Wilsons except for one; the Court vacated one of Louis Wilson's

convictions for using a firearm during and in relation to a crime of violence in violation of 18

U.S.C. § 924(c).  *See United States v. Wilson*, 160 F.3d 732 (D.C. Cir. 1998).[4]  On October 4,

1999, the Supreme Court of the United States denied the Wilsons's petition for writ of certiorari.

*Wilson v. United States*, 528 U.S. 828, 120 S.Ct. 81, 145 L.Ed.2d 69 (1999).  Petitioner Louis

Wilson timely filed the instant motion on September 29, 2000, and then submitted two

Supplemental Memoranda to his original Section 2255 motion -- one on March 1, 2001, and the

other on January 20, 2004.

## II: LEGAL STANDARD

Under Section 2255 of Title 28 of the United States Code, a prisoner in custody sentenced

in a federal court may move the sentencing court to vacate, set aside, or correct the sentence if

the prisoner believes his sentence was imposed "in violation of the Constitution or laws of the

United States . . . or that the sentence was in excess of the maximum authorized by law . . . ."  28

U.S.C. § 2255 (2005).   However, a district court judge need not conduct an evidentiary hearing

before denying a Section 2255 motion when "the motion and files and records of the case

conclusively show that the prisoner is entitled to no relief."  *Id.*; *United States v. Morrison*, 98

F.3d 619, 625 (D.C. Cir. 1996).  As the rules governing Section 2255 proceedings provide, "[i]f

it plainly appears from the face of the motion and any annexed exhibits and the prior proceedings

in the case that the movant is not entitled to relief in the district court, the judge shall make an

order for its summary dismissal . . . ."  Rules Governing § 2255 Proceedings, Rule 4, 28 U.S.C.

foll. § 2255 (2005).  Accordingly, a Section 2255 petitioner is not automatically entitled to an

evidentiary hearing, and should not receive one if his allegations are "vague, conclusory, or

---

[4] The D.C. Circuit reversed the convictions against co-defendant Marcellus Judd on the
grounds of insufficiency of evidence.  *U.S. v. Wilson,* 160 F.3d at 739.

palpably incredible" rather than "detailed and specific." *Machibroda v. United States*, 368 U.S.

487, 495, 82 S.Ct. 510, 7 L.Ed.2d 473 (1962); *see also United States v. Pollard*, 959 F.2d 1011,

1031 (D.C. Cir. 1992), *cert. denied*, 506 U.S. 915, 113 S.Ct. 322, 121 L.Ed.2d 242 (1992) ("Only

where the § 2255 motion raises 'detailed and specific' factual allegations whose resolution

requires information outside of the record or the judge's 'personal knowledge or recollection'

must a hearing be held.") (quoting *Machibroda*, 368 U.S. at 495); *United States v. McGill*, 11

F.3d 223, 225 (1st Cir. 1993) ("[E]videntiary hearings are the exception, not the rule."). This is

so even if the files and records of the case do not clearly rebut the allegations of the claim. *Id.*

The party seeking an evidentiary hearing in a Section 2255 proceeding therefore carries a fairly

high burden of demonstrating a need for such a hearing, and the decision whether to grant one is

"committed to the district court's discretion." *Pollard*, 959 F.2d at 1031.[5]

### III:  DISCUSSION

In his Section 2255 motion presently before the Court, Petitioner alleges violations of his

Fifth Amendment right to Due Process and his Sixth Amendment right to effective assistance of

counsel. *See* Pet'r Mot. at 5. Petitioner's Fifth Amendment claims are based on alleged use of

perjured testimony at trial as well as alleged nondisclosure of exculpatory information in

---

[5] Petitioner's trial and sentencing were conducted before the Honorable Chief Judge Norma Holloway Johnson, who has retired since the filing of the instant Motion in September 2000. On March 24, 2003, Petitioner's case was reassigned to the Honorable Judge Colleen Kollar-Kotelly. The Court is mindful that because a different judge presided over Petitioner's trial and sentencing, the decision to deny Petitioner's request for an evidentiary hearing may be reviewed under a less deferential standard, and the Court has therefore taken extra care in scrutinizing the parties' filings for the instant motion. *See Morrison*, 98 F.3d at 625 ("[A] district judge's decision not to hold an evidentiary hearing before denying a § 2255 motion is generally respected as a sound exercise of discretion when the judge denying the § 2255 motion also presided over the trial in which the petitioner claims to be prejudiced.").

violation of *Brady v. Maryland*.  Petitioner's Sixth Amendment claims for ineffective assistance

of counsel are based on the allegations that trial counsel failed to (1) call an alibi witness; (2)

move for a mistrial or continuance to investigate allegedly exculpatory statements; (3) advise and

prepare Petitioner to testify at trial; (4) seek a severance in order to call co-defendant Marcellus

Judd to testify on Petitioner's behalf; and (5) object to the trial court's allegedly insufficient jury

instruction for his Section 1512(a)(1)(A) charge.  The Court shall treat the substantive aspects of

each claim in sequence, as well as any procedural aspects that exist with respect thereto.

> A.      *Petitioner's Perjured Testimony, Brady, and Confrontation Claims Are*
> *Procedurally Barred*

Because of the premium placed on the finality of judgments, there are limited

circumstances under which a court should grant a Section 2255 motion.  *United States v. Frady*,

456 U.S. 152, 164, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982).  Collateral attack is not appropriate

where a prisoner had the opportunity to raise his objections to his conviction and sentence during

trial or on direct appeal and failed to do so.  *See id.* ("Once the defendant's chance to appeal has

been waived or exhausted, . . . we are entitled to presume he stands fairly and finally convicted,

especially when . . . he has already had a fair opportunity to present his federal claims to a federal

forum.").  As a result of this respect afforded final judgments, a prisoner may not raise an

objection in a Section 2255 motion that he could have contested on direct appeal unless he can

first demonstrate cause for the procedural default and then establish resulting prejudice.  *Id.* at

167-68; *see also Bousley v. United States*, 523 U.S. 614, 622, 118 S.Ct. 1604, 140 L.Ed.2d 828

(1998) ("Where a defendant has procedurally defaulted a claim by failing to raise it on direct

review, the claim may be raised in [collateral appeal] only if the defendant can first demonstrate

either cause and actual prejudice, . . . or that he is actually innocent.") (citations and internal quotation marks omitted).

The above discussion is of particular relevance to Petitioner's Fifth Amendment claims that (1) his conviction was based on allegedly perjured testimony from one of the four witnesses to the shooting, Mr. Kevin Eddings, and (2) was also in violation of *Brady v. Maryland*, as well as (3) his adopted claim from co-defendant Ralph Wilson that his confrontation rights were violated during trial.[6]  Simply, Petitioner does not meet the standards under *Frady* necessary to substantiate his new claims that were never raised previously on direct appeal:  Petitioner does not claim "actual innocence" in any of his filings, does not show cause for his procedural default, and does not show how these alleged violations prejudiced the outcome at trial or on appeal. Indeed, Petitioner does not even acknowledge the need to show cause for failure to raise these objections at trial or on appeal.  While the Government presented the argument that Petitioner's perjured testimony, *Brady*, and confrontation clause claims are procedurally barred under *Frady* in its Opposition to Petitioner's Motion, *see* Gov't Opp'n at 2 n.1, Petitioner did not respond to this argument in his Reply or Supplemental Memoranda, thereby conceding the Government's contention that Petitioner failed to raise these objections on direct appeal.

---

[6] Petitioner's ineffective assistance of counsel claims do not face the same procedural bar under *Frady*.  *See United States v. Cook*, 130 F. Supp. 2d 43, 45 (D.D.C. 2000) (citing *United States v. Johnson*, 1999 WL 414237 at *1 (D.C. Cir. May 28, 1999)) ("[w]here a petitioner raises claims of ineffective assistance of counsel in a § 2255 motion, he need not show 'cause and prejudice' for not having raised such claims on direct appeal, as these claims may be raised for the first time in a § 2255 motion"), *aff'd*, 22 Fed. Appx. 3 (D.C. Cir. 2001); *Strickland v. Washington*, 466 U.S. 668, 697-98, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).  Accordingly, Petitioner's claims of ineffective assistance of counsel are properly before the Court for review.

Moreover, Petitioner also does not attempt to establish cause for failure to raise these claims on direct appeal by showing ineffective assistance of counsel at the appellate level. *See* Gov't Opp'n at 2 n.1. Importantly, Petitioner was not represented by the same counsel at trial and on appeal, and has not claimed that his appellate counsel was ineffective for failing to raise these claims on direct appeal. Because Petitioner effectively ignores the *Frady* standard requiring a showing of cause excusing his procedural defaults as well as a showing of prejudice from the alleged violations, Petitioner is procedurally barred from asserting the perjured testimony, *Brady*, and Confrontation Clause claims in the 28 U.S.C. § 2255 motion currently before the Court. The Court shall make alternative findings as to Petitioner's *Brady* and Confrontation Clause claims. However, the Court emphasizes that its primary holding is that Petitioner has procedurally defaulted on these claims, in addition to his perjured testimony claim, without demonstrating adequate cause or prejudice to circumvent the strictures of *Frady*.

### B.     Brady Claim

Petitioner claims that this Court should grant his Motion to Set Aside, Vacate, or Correct his sentence because the Government withheld certain pre-trial statements by Kevin Eddings in violation of *Brady v. Maryland*. In *Brady*, the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or punishment . . . ." *Brady*, 373 U.S. at 87, 83 S.Ct. 1194. Since the holding in *Brady*, the Supreme Court has summarized the standard for a "*Brady* violation:"

There are three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued.

*Strickler v. Greene*, 527 U.S. 263, 281-82, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999).  The

*Strickler* Court also explained the standard for prejudice: "[T]here is never a real '*Brady*

violation' unless the nondisclosure was so serious that there is a reasonable probability that the

suppressed evidence would have produced a different verdict." *Id.* at 281.  Accordingly,

Petitioner must show that Eddings's statements were favorable to Petitioner's case; that the

statements were suppressed by the government; and that it is reasonably probable that the result

at trial would have been different had the government disclosed the statements.

Although Petitioner's brief does not make it entirely clear, it seems the *Brady* information

at issue in the instant motion is the information contained in Kevin Eddings's September 2000

affidavit statement, i.e. that he initially told the police that he was not sure whether it was

GlennYoung or Petitioner who shot Leroy Copeland, *see* Att. A to Pet'r Mot at 2, as well as

Eddings's pre-trial statements that another witness, Glenn Young, was near Copeland at the time

Copeland was shot.  *See* Att. B to Pet'r Mot.,  Pet'r Mot. at 10.  Importantly, Eddings's pre-trial

statements, given to a police investigator and before a grand jury on May 1, 1996, were included

with materials provided to defense counsel by the government on the evening preceding Kevin

Eddings's testimony at trial.  *See* Att. H to Gov't Opp'n; Gov't Opp'n at 26.

First, as to the contents of Kevin Eddings's September 2000 affidavit, stating that he was

not sure whether it was Petitioner or Glenn Young who shot Leroy Copeland, *see* Att. A to Pet'r

Mot. at 2, the uncertainty expressed within this document was fleshed out during Eddings's

testimony before the police, a grand jury, and at trial that identified Petitioner as the man who

shot Leroy Copeland.  *See, e.g.*, Tr. 6:118-119, 122-23, 6:134-36, 138, 142, 144-47, 149, 151-52;

7:41, 45.  Next, the fact that the government disclosed the information in Eddings's police

statements and grand jury testimony (one-day) prior to Eddings's testimony refutes Petitioner's

contention that the evidence was suppressed and a *Brady* violation ensued.  Perhaps most

importantly, attorneys for Petitioner and his co-defendants had the knowledge that Glenn Young

was near Leroy Copeland at the time of his death prior to his testifying at trial.  In addressing a

similar argument on appeal,[7] the D.C. Circuit noted that "a new trial is rarely warranted based on

a *Brady* claim where the defendants obtained the information in time to make use of it."  *United*

*States v. Wilson*, 160 F.3d at 742 (citing *United States v. Dean*, 55 F.3d 640, 653 (D.C. Cir.

1995); *United States v. Paxson*, 861 F.2d 730, 737 (D.C. Cir. 1988); *United States v. Tarantino*,

846 F.2d 1384, 1417 (D.C. Cir. 1988)).  Defense counsel obtained Eddings's statements in time

to use them at trial, and in fact did so during cross-examination of Eddings.  *See* Gov't Opp'n at

30 n. 23, 31.  Upon cross-examination of Eddings and Kirk Thomas, counsel for Petitioner and

co-defendants were able to present evidence that Glenn Young had a motive for shooting Leroy

Copeland and to undermine the "certainty" of Eddings's recollection in front of the jury.  Tr.

6:84-85; *see* Gov't Opp'n at 31.

---

[7] On direct appeal, co-defendant Ralph Wilson raised the issue that statements by Kevin Eddings regarding Kirk Thomas, also part of Eddings's grand jury testimony and provided to defense counsel the day before trial, were disclosed too late.  *United States v. Wilson*, 160 F.3d at 741.  Under Ralph Wilson's theory, the late disclosure deprived the defense of a viable third-party shooter defense.  The D.C. Circuit held that no *Brady* violation had occurred since appellants (Petitioner and his brother) "made effective use of the statements at trial."  *Id.* at 741, 742.

A review of the trial record clearly demonstrates that the very confusion reflected in Eddings's 2000 affidavit and the *Brady* material disclosed before his testimony was elicited at trial by counsel for both Petitioner and co-defendant Ralph Wilson, and therefore available for the jury's consideration.  Counsel for Petitioner brought out from Eddings that he had stated that a photograph of Louis "resembled" the shooter.  Tr. 6:118-119.  Further, Petitioner's counsel garnered from Eddings that he had seen a guy at the playground who resembled the shooter in that they had "similar" jackets but that he never saw the face of the individual at the playground, and that the shooter, like the individual at the playground, wore a beige jacket and blue jeans.  Tr. 6:122-23, 152; 7:41, 45.  During the portion of the cross-examination handled by co-defendant Ralph Wilson's counsel, Eddings further undercut his "certainty" -- and left the door open to Petitioner's argument that other individuals at the scene could have murdered Copeland -- by testifying that:  (1) Copeland said the guy with "Head" at the playground said that he was "hot," and to run if that guy moved or came towards them, and when that guy got up they ran, *see* Tr. 6:134-36, 143; (2) he saw the guy from the playground at 5th and N, *see* Tr. 6:144; and (3) he saw the person who had been leaning on the wall of the store, whom he had also seen at the playground, shoot Copeland and this was not the person that he had run from at the playground, *see* Tr. 6:149, *but see* Tr. 6:151 (where Eddings said that the person who sat next to "Head" at the playground was the person who shot Copeland).  Finally, counsel for Ralph Wilson was able to impeach Eddings during cross-examination with:  (1) his April 19, 1996 statement, wherein he said that "Head" and the guy with him "jumped up suddenly and made a quick movement that caused" him and Copeland to run, *see* Tr. 6:138; and (2) his grand jury testimony, wherein Eddings had testified that he and Copeland ran when the guy on the wall got up, *see* Tr. 6:142,

and "Head" was by the church at 5th and O, *see* 6:145-47.  Accordingly, a review of Eddings's

cross-examination reveals that Eddings was not as "certain" at trial as Petitioner now claims, and

that virtually all of the information contained within his 2000 affidavit was available for the

jury's consideration.

Finally, even if the disclosure of Eddings's statements could be considered untimely or

undisclosed, Petitioner fails to show how confidence in the outcome at trial would be

undermined with earlier knowledge of Eddings's statements.  The alleged  untimely or

nondisclosure of Eddings's statements does not rise to the level of a *Brady* violation because

Petitioner has not shown that it is reasonably probable that such information would have led to a

different result at trial.  *See Strickler*, 527 U.S. at 281, 119 S.Ct. 1936.  Petitioner speculates that

Eddings's statements would have impeached him and discredited his identification of Petitioner

as the shooter, and set off a cascade of doubt surrounding the other eyewitness testimony from

Young, Carrington, and Thomas.  *See* Pet'r Mot. at 9, 13.  However, in this case, there was

"nonconflicting, nonambiguous, and overwhelming evidence against [Petitioner and his

brother]," *United States v. Wilson*, 160 F.3d at 741, including Eddings's identification of

Petitioner before the police, the grand jury, and at trial, and the unanimous identification

testimony of Messrs. Carrington, Young, and Thomas.  *See* Tr. 4:17-20, 22-25, 38, 56, 63, 114

(Carrington); Tr. 5:30, 31, 37, 44, 49, 57, 59-60, 90; 7:38-39 (Young); Tr. 6:25, 29-32, 35-38,

159 (Thomas).[8]  Simply, Petitioner overlooks the weight of the evidence against him, and does

---

[8] The United States Court of Appeals for the District of Columbia summarized all of the
evidence against Petitioner and his brother as follows:

The Lorton tape . . . established their motive to kill and to retaliate; James's
attorney testified that Ralph had heard portions of the tape; Thomas testified that

not overcome that weight to show that the trial would have been different with earlier knowledge of Eddings's statements.  *See United States v. Wilson*, 160 F.3d at 742..

For the reasons set forth above, the Court finds that Petitioner does not make the necessary showing of a violation of *Brady v. Maryland* in order for the Court to grant his Section 2255 motion on those grounds.

> C.    *Ineffective Assistance of Counsel Claims*

Finally, Petitioner claims that his conviction and sentence for charges related to the death of Leroy Copeland should be vacated, set aside, or corrected because Petitioner did not receive effective assistance of counsel at trial in violation of the Sixth Amendment.  Pet'r Mot. at 2, 13-14.  Specifically, Petitioner claims that his trial counsel's performance was deficient for failing to (1) present the testimony of an alibi witness, Leroy Singletary, at trial; (2) move for a mistrial or a mid-trial continuance to investigate the pre-trial statements of Kevin Eddings; (3) advise and prepare Petitioner to testify at trial; (4) seek a severance at trial in order to call co-defendant Marcellus Judd as a witness on Petitioner's behalf; and (5) object to the trial court's allegedly insufficient jury instruction for his Section 1512(a)(1)(A) charge.  *See id.* at 14, 16, 18; Pet'r 1st Supp. at 1-3; Pet'r 2nd Supp. at 1-3.

Under the test for ineffective assistance of counsel established in *Strickland v. Washington*, a successful claim must meet two requirements.  466 U.S. at 687, 104 S.Ct. 2052.

---

on that same night Ralph enlisted his help in finding Copeland; Hamilton saw Ralph and Louis armed at 5th and O Streets, N.W., looking for Copeland around noon on the day of the murder; and in a telephone conversation after the murder Ralph told James's son that his father's trial "looked alright now."  In addition, four eyewitnesses saw Louis shoot Copeland.

*United States v. Wilson*, 160 F.3d at 741 n.8.

First, a party must show that his attorney's deficient performance was "so serious that counsel was not functioning as the 'counsel' guaranteed [] by the Sixth Amendment." *Id*. A court conducting an inquiry should measure attorney performance under "prevailing professional norms," and "[j]udicial scrutiny of counsel's performance must be highly deferential." *Id*. at 688, 689, 104 S.Ct. 2052. In short, a petitioner must overcome a strong presumption that counsel rendered adequate and effective assistance. *See id*. at 690, 104 S.Ct. 2052 ("[T]he Court should recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment."); *see also United States v. Askew*, 88 F.3d 1065, 1070-71 (1996) (explaining *Strickland* standard for deficient performance); *United States v. Mitchell*, 216 F.3d 1126, 1130-31 (2000) (same).

Second, it is not enough to show that counsel's performance was professionally deficient, but there must also be prejudice sufficient to create a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694, 104 S.Ct. 2052. That some effect on the outcome of trial is conceivable does not meet the level of prejudice contemplated in *Strickland*. *Id*. at 693, 104 S.Ct. 2052. Finally, a court deciding an ineffective assistance of counsel claim does not need to address both the deficient performance and prejudice components of the inquiry if there has been an insufficient showing on one prong. *Id*. at 697, 104 S.Ct. 2052. "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." *Id*. Accordingly, Petitioner must show that his trial counsel made professional errors sufficient to affect the outcome at trial.

14

1.      <u>Failure to Call Leroy Singletary</u>

Petitioner's first ineffective assistance claim rests on the idea that his trial counsel should have called Leroy Singletary -- Petititoner's cousin -- to testify that Petitioner was home watching television with him at the time of the murder.  Pet'r Mot. at 14.  The claim that this failure constituted deficient performance must be rejected for three reasons.  First, it is clear that Petitioner's counsel, Mr. Birdsong, considered the option of calling Singletary to testify on Petitioner's behalf, but -- after weighing the benefits of such a decision against the attendant risks -- exercised his professional judgment as an experienced counsel and declined to call Mr. Singletary.  According to Mr. Birdsong:

> Prior to trial I interviewed defendant's alibi witness, Leroy Singletary.  Mr. Singletary did not recall any specifics concerning the night of the murder, and I did not find him to be a credible or helpful alibi witness for Mr. Wilson.  I also knew he could be impeached with his prior record and with his relationship to Mr. Wilson.

App. F to Gov't Opp'n at 3, ¶ 6.  As such, it is clear that Mr. Birdsong considered the option of calling Singletary, spoke with him in person, was able to personally assess his demeanor and credibility, and made the judgment call that -- given certain concerns -- the risks were too great to call Singletary as a witness.  Given these reasonable considerations, practical concerns, and his exercise of professional judgment, the tactical decision by trial counsel to avoid calling Singletary to testify, only to have him impeached at trial, was well within the bounds of professional reasonableness.  *See Strickland*, 466 U.S. at 689, 104 S.Ct. 2052.

Second, a review of Singletary's affidavit, submitted with Petitioner's Motion before this Court, reveals that Mr. Birdsong's concerns might well have been justified.  A plain reading of Singletary's affidavit reveals a glaring lack of specificity and convincing evidence that might

have plagued Singletary's testimony at trial, in addition to the fact that he was Petitioner's cousin and possessed a prior criminal record. *See* Att. C to Pet'r Mot at ¶ 4 ("Usually, after he got off work and after I finished working, we would walk to the store and buy beer.  Then we would go back to Louis's house on New York Avenue and watch television."), ¶ 6 ("Back then, I know that I was able to remember the specific day that it happened, but at this time I cannot remember how I was able to remember the exact day.").

Third, Petitioner's claim is that it fails to meet the standard for prejudice.  Even if failure to call Singletary could be considered constitutionally deficient performance on the part of Petitioner's trial counsel, Petitioner has not shown that with Singletary's testimony, it is reasonably probable that the result of trial would be different.  *See Strickland*, 466 U.S. at 694, 104 S.Ct. 2052.  Again, in light of the overwhelming evidence against Petitioner and his brother, revealed at trial and affirmed on appeal, testimony from an arguably non-credible witness is not reasonably likely to have affected the outcome at trial.  *See id.*

### 2.   Failure to Request Continuance to Investigate Eddings's Statements

Petitioner's second basis for claiming ineffective assistance of counsel is that trial counsel failed to move for a mistrial or a mid-trial continuance in order to investigate the pretrial statements of Kevin Eddings disclosed to the defense the evening before Eddings testified at trial. Pet'r Mot. at 16.  According to Petitioner, his trial counsel should have requested a continuance to interview Eddings, rather than simply proceeding with cross-examination of Eddings.  *Id.* at 15-16.  The Court concludes that this prong of Petitioner's ineffective assistance claim fails because Petitioner is unable to establish what information the defense stood to gain from interviewing and investigating Eddings.  In addition, Petitioner does not establish the requisite

prejudice to support a claim of ineffective assistance of counsel, i.e. a reasonable probability that the result of trial would have been different if not for the failure of trial counsel to seek a continuance to investigate Eddings. *See Strickland*, 466 U.S. at 694, 104 S.Ct. 2052.

The Court is guided by *United States v. Askew*, in which the D.C. Circuit held that when a convicted defendant attempts to gain collateral relief based on failure of trial counsel to investigate, a court should require the petitioner to show "to the extent possible precisely what information would have been discovered through further investigation." 88 F.3d at 1073. The Court explained:

> Any other rule would give defendants an incentive to present as little evidence as is necessary to create some doubt . . . Although defendants are entitled to the benefit of a reasonable doubt at trial, an appellate court should not overturn a conviction simply because the defendant has teasingly suggested that there may be facts out there that his trial counsel could have discovered and that would have helped his case.

*Id*. Here, Petitioner argues that his trial counsel would have discovered that "Eddings had stated that someone other than Louis Wilson shot Copeland," and that "Eddings . . . believed that [the shooter] may have been Young," which is supposedly information Eddings provided in his September 2000 affidavit, attached to Petitioner's Section 2255 Motion. *See* Pet'r Mot. at 17-18. In fact, these statements essentially misrepresent the contents of Eddings's affidavit, which indicates nothing more than the fact that, as he recalls four years later, Eddings may have been less than sure that Petitioner was the person who shot Leroy Copeland March 25, 1996. *See* Att. A to Pet'r Mot. Aside from Petitioner's hopes as to what information Eddings could provide at this late date, it is clear that Petitioner's trial counsel already had in his possession enough information of the type Petitioner speculates would have been discovered upon further

17

investigation of Eddings.  For example, counsel for Petitioner and co-defendants vigorously

cross-examined Eddings and the other witnesses, and were able to develop theories that others

present at the scene of Copeland's murder, including Kirk Thomas and Glenn Young, had

motives to kill Copeland and some evidence to implicate them.  *See* Gov't Opp'n at 31.  Counsel

for both Petitioner and co-defendant Ralph Wilson concurred that -- after exercising their

professional judgment -- they had sufficient evidence to proceed with a cross-examination of Mr.

Eddings and that any further investigation would prove fruitless.[9]

Moreover, given the totality of the trial testimony from Eddings, Carrington, Young, and

Thomas, including identification of Petitioner as the shooter from all four witnesses, as well as

the other "nonconflicting, nonambiguous, and overwhelming evidence" against Petitioner and his

brother, *see United States v. Wilson*, 160 F.3d at 741 n.8, Petitioner fails to show there is a

reasonable probability that an investigation into Eddings's alleged uncertainty would undermine

the Court's confidence in the outcome at trial, as required by *Strickland* for a finding of

ineffective assistance of counsel.  *See Strickland*, 466 U.S. at 694, 104 S.Ct. 2052.  The Court

simply cannot vacate, set aside, or correct Petitioner's sentence absent a showing of prejudice to

---

[9] In his affidavit attached to the Government's Opposition to Petitioner's Motion, trial counsel Leonard Birdsong stated: "I did not have any information, nor did I believe that there was information in Eddings' statements that would lead to exculpatory evidence or other evidence that might help Mr. Wilson's case.  I do recall cross-examining Eddings with information from those statements and using various information from those statements to assist in my cross-examination of other government witnesses.  I did not seek a continuance because I did not believe that the Court would grant such a continuance."  App. F to Gov't Opp'n ¶ 3. Gregory Spencer, trial counsel for co-defendant Ralph Wilson, echoes Mr. Birdsong's reasoning in his November 2000 affidavit: "I did not have any information, nor did I think that there was any information in Eddings' statements that might lead to anything that might really help Mr. Wilson's case.  We cross-examined Eddings with information obtained from these statements and used information from these statements to assist in cross-examination of other government witnesses."  App. G to Gov't Opp'n to Ralph Wilson's Mot. ¶ 7.

sustain Petitioner's claim of ineffective assistance of counsel for failing to seek time to investigate.

### 3.   Failure to Advise and Prepare Petitioner to Testify at Trial

Petitioner's next Sixth Amendment ineffective assistance of counsel claim relies on the argument that Petitioner's trial counsel failed to advise or prepare him to testify at trial. Pet'r Mot. at 2, 18-20. In an affidavit submitted with Petitioner's Motion and dated September 26, 2000, Petitioner provides: "I [] told my trial lawyer that I wanted to testify at trial, but my lawyer never prepared me to testify . . . Although I wanted to testify at trial, I did not because my lawyer told me that I should not testify and because my lawyer did not prepare me to testify." Att. E to Pet'r Mot. ¶ 6. Petitioner maintains that trial testimony on his own behalf would have corroborated the alibi defense set forth by trial counsel and supported by testimony from Jacqueline Wilson.[10] Pet'r Mot. at 19-20.

The Court recognizes that "the defendant's right to testify is a fundamental constitutional right . . . that is personal to the defendant and cannot be waived by counsel or the court." *United States v. Ortiz*, 82 F.3d 1066, 1070 (D.C. Cir. 1996) (citations and internal quotation marks omitted). Understanding the significance of this right, the trial court brought Petitioner to the bench before the close of his case, inquired whether Petitioner wished to testify, and gave Petitioner the explicit opportunity to do so. Tr. 8:152. The trial court conducted the following inquiry:

---

[10] Jacqueline Wilson, co-defendant Ralph Wilson's wife, testified on behalf of Petitioner that when she came home between 5:30 and 6:00 p.m. on the night of the murder, Petitioner was at home and -- to her knowledge -- remained at home watching television.

THE COURT:  Mr. Louis Wilson, I know that Mr. Birdsong has advised you of your right to testify as well as your right not to testify in this cause.  And we thought that before he closes his case on your behalf, we would ask you what is your present decision.  Do you wish to testify, or do you wish to remain silent?

DEFENDANT LOUIS WILSON:  I wish to remain silent.

THE COURT:  All right.  I'm sure Mr. Birdsong has explained all your rights to you and you are satisfied with what he has explained to you; isn't that correct?

DEFENDANT LOUIS WILSON:  Yes, I am.

THE COURT:  Well, I would think with his statement, Mr. Birdsong, as you thought would be, that he [Mr. Louis Wilson] chooses to remain silent.  He has that First Amendment right, and the only thing we wanted to do is put it on the record, okay?

DEFENDANT LOUIS WILSON:  Okay.

THE COURT:  Thank you very much.

DEFENDANT LOUIS WILSON:  All right.

Tr. 8:153.[11]  Importantly, despite being provided the opportunity, Petitioner did not inform the trial judge that he was not prepared and therefore could not testify.  Rather, the colloquy on the record before the trial court highlights Petitioner's explicit, knowing waiver of his right to testify on his own behalf.

In addition to the fact that the trial court actually provided Petitioner with an explicit opportunity to testify, Petitioner fails to establish that his testimony would have sufficiently

_____

[11] The Government submitted an affidavit from Leonard Birdsong, Petitioner's trial counsel, as Appendix F to its Opposition.  Mr. Birdsong's affidavit is consistent with the record developed at trial, as opposed to petitioner's affidavit filed with this motion.  According to Mr. Birdsong, "[p]rior to trial I discussed the possibility of Mr. Wilson testifying at trial.  I prepared Mr. Wilson to testify, went through the areas of inquiry with him, discussed cross-examination, and discussed with him the advantages and disadvantages of his testifying. . . . I never told Mr. Wilson that he could not testify, rather that it was his decision. . . . Mr. Wilson decided not to testify."  App. F to Gov't Opp'n at 3, ¶ 5.

supported his alibi defense so as to create a reasonable probability that the result of the trial

would have been different. *See Strickland*, 466 U.S. at 694, 104 S.Ct. 2052; *see also United*

*States v. Tavares*, 100 F.3d 995, 998-99 (D.C. Cir. 1996), *cert. denied*, 520 U.S. 1160, 117 S.Ct.

1344, 137 L.Ed.2d 502 (1997) (absent a showing of reasonable probability of a different outcome

at trial if defendant had testified, counsel's failure to ensure that defendant had an opportunity to

testify did not amount to ineffective assistance of counsel).  Stated another way, even if

Petitioner's testimony at trial could have contributed something substantial to his defense,

evidence against Petitioner and his brother in the death of Leroy Copeland is so strong that

Petitioner's contentions do not undermine the Court's confidence in the outcome of the trial, as

affirmed on appeal.  *United States v. Wilson*, 160 F.3d at 750.

4.      Failure to Seek a Severance

In his March 2001 Supplemental Memorandum in support of his Section 2255 motion,

Petitioner argues that his trial counsel's performance was deficient due to his failure to seek a

severance in order to call co-defendant Marcellus Judd as a witness on Petitioner's behalf.  Pet'r

Supp. 1 at 2.  In support of his Supplemental Memorandum, Petitioner attaches an affidavit

signed by co-defendant Marcellus Judd on February 27, 2001.  Judd's affidavit, safely signed

well after his convictions were reversed by the D.C. Circuit, *see U.S. v. Wilson*, 160 F.3d at 739,

makes two central points:  (1) Judd was standing next to Copeland when he was shot and,

although Judd never saw the shooter in the face, he concluded that the shooter "was not Louis"

because "[t]he shooter was shorter and smaller than Louis," *see* Att. A to Pet'r 1st Supp. ¶¶ 1-3;

and (2) contrary to the testimony of trial witness Steve Hamilton, Judd never said that he told

Petitioner that Mr. Copeland was in the area that night, *id.* ¶ 4.  Judd concludes his affidavit by

21

noting that "[a]lthough I did not want to testify at my own trial because of my record, if Louis's

lawyer had asked me to testify for Louis at a separate trial, I would have testified." *Id.* ¶ 5.

Two points are relevant. <u>First</u>, Petitioner's trial counsel actually filed a motion to sever

Petitioner's trial from those of co-defendants Ralph Wilson and Marcellus Judd on November

11, 1996. *See* Dkt. Entry #30. While the focus of that motion was the argument that Petitioner

required protection from the inculpatory statements made by Judd and certain to be introduced

against him, the effect of the motion -- i.e., severance from Judd -- would have been identical to

the argument that Petitioner currently proffers. The Government responded to Petitioner's

motion to sever on December 12, 1996, *see* Dkt. Entry # 38; Chief Judge Johnson held a Motion

Hearing on January 23, 1997; and the motion was denied in an Order dated February 19, 1997,

*see* Dkt. Entry #103. The district court's denial of Petitioner's motion for severance was upheld

on appeal in *United States v. Wilson*, 160 F.3d at 739. Accordingly, it is clear that counsel for

Petitioner actively sought a severance for Petitioner, although on different grounds than those

upon which Petitioner currently focuses.

<u>Second</u>, notwithstanding the actual severance motion filed by Petitioner's counsel and

denied by the trial court, Petitioner fails to meet the requirements necessary to establish a case for

severance based on the asserted need for a co-defendant's testimony. In *United States v. Ford*,

870 F.2d 729 (D.C. Cir. 1989), the D.C. Circuit set forth "four preconditions necessary for a

movant to establish a *prima facie* case for severance based on an asserted need for a co-

defendant's testimony." *United States v. Washington*, 12 F.3d 1128, 1133 (D.C. Cir. 1994), *cert.*

*denied*, 513 U.S. 828, 115 S.Ct. 98, 130 L.Ed.2d 47 (1994). The movant must show: "(1) a bona

fide need for the testimony; (2) the substance of the testimony; (3) the exculpatory nature and

22

effect of the testimony; and (4) the likelihood that a co-defendant will testify if the cases are

severed." *Ford*, 870 F.2d at 731.  "A failure to demonstrate any one of these elements is

dispositive." *Washington*, 12 F.3d at 1133.  "Once the movant makes that threshold showing, the

trial Court must then: "(1) examine the significance of the testimony in relation to the

defendant's theory of the case; (2) assess the extent of prejudice caused by the absence of the

testimony; (3) consider the effects on judicial administration and economy; and (4) give weight

to the timeliness of the motion." *Ford*, 870 F.2d at 731 (citations omitted).  In this balancing

analysis, the court also considers "the extent to which proffered exculpatory testimony could be

impeached." *Id.* at 732-33.  A defendant must meet these stringent standards because, as the

D.C. Circuit has noted, "Rule 14 [should not be read] as a mechanism for alleged co-conspirators

to control the order in which they are tried." *Id.* at 731 (citations and internal quotation marks

omitted).

Upon an examination of Petitioner's Supplemental Memorandum and Judd's affidavit, it

is clear that Petitioner cannot establish the *prima facie* case for severance.  Importantly,

Petitioner cannot "demonstrate a *reasonable probability* that the proffered testimony would

[have been] forthcoming." *Ford*, 870 F.2d at 731 (citing *United States v. Parodi*, 703 F.2d 768,

779 (4th Cir. 1983)) (emphasis in original).  Judd's cursory affidavit, crafted four years after

Petitioner's trial for the murder of Copeland and two years after Judd's conviction was

overturned by the D.C. Circuit, makes no such claim.  Rather, Judd merely states that "if Louis's

lawyer had asked me to testify for Louis at a separate trial, I would have testified." *See* Att. A to

Pet'r 1st Supp. ¶ 5.  Judd does not claim that (1) he ever notified Petitioner of his willingness to

testify on his behalf before or during trial, (2) he ever notified Petitioner's counsel of this

23

willingness, or (3) he notified the trial court of this willingness.  Moreover, in his own Motion to

Sever Defendants, *see* Dkt. Entry #20, Judd never asserted this willingness to testify as a basis

for severance.  Moreover, while Judd claims that the only motivation behind his refusal to testify

at the combined trial was a concern regarding his "record," *id.*, if severance had been granted and

Judd testified at trial for Petitioner, he could have been freely impeached and his statements

entered against him at his own later trial.  Due to this danger, it is reasonable to expect that Judd

would have conditioned his offer to testify on the agreement that he would be tried before

Petitioner.  "This tack has received judicial disapprobation elsewhere," and the D.C. Circuit and

others have consistently held that "Rule 14 [should not be read] as a mechanism for alleged co-

conspirators to control the order in which they are tried."  *Ford*, 870 F.2d at 731 (citations

omitted).  Given virtually the same failings, the D.C. Circuit in *Ford* found that the petitioner

"could not satisfy the requirement that he demonstrate a reasonable probability of [the co-

defendant's] willingness to testify."  *Id.* at 732.  Moreover, while it was clear in *Ford* that the co-

defendant and petitioner both informed the court on the day of trial that the co-defendant would

testify in an exculpatory manner if the trials were severed, no such proffer was made in this case.

Instead, the Court is left with a vague affidavit made four years after the fact that gives no hint as

to whether Judd would have been willing to take such a step at that point.  As such, the Court

must conclude that Petitioner fails to meet the "reasonable probability" requirement necessary to

establish a *prima facie* case for severance based on the asserted need for Judd's testimony.

   Even assuming *arguendo* that Petitioner could have somehow met the "reasonable

probability" prong of the *prima facie* case test, Petitioner would still fail to meet the remaining

*Ford* requirements.  Importantly, once a movant demonstrates the four elements of the *prima*

*facie* case, the court is to consider four additional balancing factors and is also to consider "the extent to which the proffered testimony could be impeached." *Id.* at 732-33.  Here, two of these factors arguably support a denial of a motion to sever:  (1) the effects on judicial administration and economy, as separate trials for Judd and the Wilsons, or separate trials for all three co-defendants, certainly would have vastly increased the cost of trying the defendants' cases and expended roughly three times the amount of time; and (2) the timeliness of the motion, as Judd has only come forward with his willingness to testify four years after trial and two years after his convictions have been overturned.  Moreover, it is clear that Judd's testimony could have been impeached due to (1) his prior record, and (2) the conflicting testimony of Hamilton, Eddings, Young, Carrington, and Thomas.  As such, even if Petitioner could have met the *prima facie* test, it is quite likely that -- given the relevant balancing factors -- any motion to sever made by his counsel based upon the need to use Judd's proffered testimony would have been denied.  As such, Petitioner cannot show that, had his counsel sought a severance on these grounds, there would be a reasonable probability that the result of the trial would have been different.  *See Strickland*, 466 U.S. at 694, 104 S.Ct. 2052.

 5. Failure to Object to Allegedly Improper Jury Instructions

In Petitioner's Supplemental Motion and Memorandum, he argues that the jury was improperly instructed as to Count Two of the indictment, charging him with the killing of a Government witness in violation of 18 U.S.C. § 1512(a)(1)(A).  Pet'r 2nd Supp. at 1-3. Petitioner contends that the Court ought to have instructed the jury as to the element of killing in this charge, specifically that the Court should have instructed the jury on malice aforethought. *Id.* at 2.  Petitioner claims that this failure prejudiced his "substantial rights and fairness and

integrity of the trial." *Id.*

Two central problems exist with Petitioner's claim.  First, it is undisputed that the defense did not object to the instruction at trial.  *Id.* at 2-3.  Moreover, Petitioner failed to raise his improper jury instruction on direct appeal.  It is well settled that a defendant is procedurally barred from raising a claim on collateral attack if he failed to raise that claim at trial or on direct appeal, unless he can establish "cause" excusing his double procedural fault, and "actual prejudice" resulting from the errors of which complains.  *Bousley*, 523 U.S. at 622, 118 S.Ct. 1604; *Frady*, 456 U.S. at 167-68, 102 S.Ct. 1584.  In his Supplemental Motion relating to this claim, Petitioner makes the cursory statement that his failure was due to the ineffectiveness of the his trial counsel.  *Id.* at 2-3.[12]  In support of this conclusory claim, Petitioner makes no reference to how trial counsel's efforts in this regard violated the *Strickland* standard.  *Id.*  Petitioner's conclusory assertions are simply insufficient to establish the "cause" necessary to overlook his procedural failing.

Second, even assuming *arguendo* that Petitioner had met his procedural obligations or could show the "cause" necessary to excuse his procedural default, his claim is without merit -- i.e., he cannot show the kind of "actual prejudice" necessary to support his contention that a fundamental error occurred.  Petitioner was charged with the offense of killing a witness under 18 U.S.C. § 1512(a)(1)(A), which provides in relevant part that "[w]hoever kills or attempts to kill another person, with intent to . . . prevent the attendance or testimony of any person in an official proceeding . . . shall be punished as provided in paragraph (3)."  Paragraph (3) specifies

---

[12] Petitioner's appellate counsel, a different attorney, also did not raise this issue; however, Petitioner does not claim that his appellate counsel provided ineffective assistance.

the punishment for murder as the death penalty or life imprisonment.  *See* 18 U.S.C. §

1512(a)(3).  Contrary to Petitioner's assertion, this offense does not require an instruction

regarding premeditation and/or malice aforethought.  *See Duarte v. United States*, 289 F. Supp.

2d 487, 490 (S.D.N.Y. 2003)*, aff'd*, --- Fed. Appx. ----, 2005 WL 1527787 (2d Cir. June 28,

2005) (rejecting a challenge, pursuant to *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348,

147 L.Ed.2d 435 (2000), to the absence of a jury finding of premeditation under Section

1512(a)(1)(A), and holding that a jury finding of premeditation was not necessary for the

imposition of a life sentence under this section).  Indeed, the D.C. Circuit, in rejecting

Petitioner's claims that his D.C. conviction for premeditated first-degree murder while armed

merged with his federal convictions for killing a witness, emphasized that "[t]he D.C. Code

section requires premeditation, an element not present in either of the federal offenses."  *Wilson*,

160 F.3d at 748 n.20.[13]  As such, because the offense charged in Count Two of Petitioner's

indictment did not require an instruction on premeditation or malice aforethought, the trial

court's failure to give such an instruction was not erroneous and Petitioner is not entitled to

relief.

     D.    *Evidentiary Hearing Not Necessary*

     Petitioner requests an evidentiary hearing on his Section 2255 Motion.  However,

Petitioner does not meet the threshold of establishing "detailed and factual" allegations which

would require discussion beyond the Court's treatment in this Memorandum Opinion.

---

[13] Even if an instruction was warranted, Petitioner could not establish prejudice from the
failure to provide such an instruction given the fact that he was also convicted for premeditated
first-degree murder while armed -- a charge which the trial court did give an instruction regarding
premeditation.  *See* Tr. 3/17/97, vol. 12, at 31-32.

*Machibroda*, 368 U.S. at 495, 82 S.Ct. 510.  Nothing in Petitioner's Motion necessitates the

consideration of any information not within the briefings and record before the Court.  As

Petitioner's claims of perjured testimony and *Brady* claims are procedurally barred under *United*

*States v. Frady*, the Court summarily denies them without need for a hearing.[14]  The Court finds

that Petitioner's ineffective assistance of counsel claims are vague and speculative, and do not

require a hearing absent the required showing of prejudice to Petitioner.  *See Morrison*, 98 F.3d

at 626 ("[A] summary denial of a § 2255 motion is appropriate when the ineffective assistance

claim is speculative."); *United States v. Sayan,* 968 F.2d 55, 66 (D.C. Cir. 1992) ("[W]hen a

section 2255 motion involves ineffective assistance of counsel claims, no hearing is necessary if

the alleged deficiencies of counsel did not prejudice the defendant."); *United States v. Fennell*,

53 F.3d 1296, 1304 (D.C. Cir. 1995) ("With two exceptions, claims of ineffective assistance of

counsel require a fact-finding hearing, . . . One exception occurs when the trial record alone

conclusively shows that the [petitioner] is entitled to no relief.").

## IV:  CONCLUSION

Petitioner's motion for collateral relief pursuant to 28 U.S.C. § 2255 does not mount a

challenge sufficient to convince the Court that Petitioner's sentence was fundamentally unfair or

imposed in violation of the United States Constitution.  Petitioner's Fifth Amendment claims,

alleging perjured testimony and violation of *Brady v. Maryland*, are procedurally barred under

*United States v. Frady*.  Furthermore, even overlooking this procedural bar, the Fifth Amendment

claims fail because Petitioner does not demonstrate that the alleged violations were prejudicial.

---

[14] Given the procedural and legal infirmities with Petitioner's motion, the Court need not
resolve all potential factual disputes relating to these claims.

Petitioner's Sixth Amendment claims, based on various allegations of ineffective assistance of counsel, also lack merit.  Petitioner does not establish prejudice, such that if not for his trial counsel's alleged deficiencies, the result of Petitioner's trial would have been different.  The Court finds that the filings and record of this case show conclusively that Petitioner is not entitled to the requested relief, and therefore there is no need for a hearing on the instant Motion.  For the reasons set forth above in this Memorandum Opinion, the Court shall deny Petitioner's Motion to Vacate, Set Aside, or Correct Sentence pursuant to 28 U.S.C. § 2255.  An Order accompanies this Memorandum Opinion.


Date:   September 12, 2005


                                             _____/s/_____
                                             COLLEEN KOLLAR-KOTELLY
                                             United States District Judge